**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

STRATA PRODUCTION COMPANY, a New
Mexico corporation; and MANZANO, LLC, a
New Mexico limited liability company,

       Plaintiffs,

v.                                  No. Civ. 13-205 JCH-GBW

SALLY JEWELL, in her official capacity as
Secretary of the United States Department of
the Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
UNITED STATES BUREAU OF LAND
MANAGEMENT, a bureau within the
Department of the Interior; and JESSE JUEN,
in his official capacity as State Director of the
New Mexico State Office of the Bureau of
Land Management,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On October 31, 2013, Defendants Sally Jewell, the United States Department of the
Interior, the Bureau of Land Management, and Jesse Juen ("Defendants") filed a Motion to
Dismiss (ECF No. 29).  The Court, having considered the motion, pleadings, briefs, evidence,
and law, concludes that the motion to dismiss should be granted in part and denied in part as
described herein.

## I.    INTRODUCTION

An area near Carlsbad in southeastern New Mexico contains large deposits of oil, gas,
and potash, which are potassium-bearing salts primarily used for fertilizer.  Notice of
Availability of the BLM's Responses to Public Comments and of the BLM's Environmental
Assessment on the Proposed Order of the Secretary on Oil, Gas, and Potash Leasing and

Development Within the Designated Potash Area of Eddy and Lea Counties, NM ("Notice"), 77 Fed. Reg. 71822, 71823 (Dec. 4, 2012). The oil and gas in the area are located in formations below the potash deposits, creating a challenge to produce potash and oil and gas at the same time in the same area. *Id.*

On December 3, 2012, Ken Salazar, the former Secretary of the United States Department of the Interior ("Interior"), signed Secretarial Order No. 3324 ("2012 Order") to provide "procedures and guidelines for more orderly co-development of oil, gas, and potash deposits owned by the United States within the Designated Potash Area" of Eddy and Lea Counties, New Mexico, (hereinafter "Secretarial Area") "through safe, concurrent operations." Am. Compl., Ex. A ("2012 Order") 1, 12, ECF No. 13-1. The 2012 Order revised and superseded the Secretarial Order dated October 28, 1986 ("1986 Order"), as corrected on August 26, 1987. 2012 Order 1, ECF No. 13-1.

Plaintiff Strata Production Company ("Strata") is an independent explorer and developer of oil and gas resources in New Mexico and is a federal lessee and operator on approximately 7,640 acres located within the Secretarial Area. Am. Compl. ¶ 11, ECF No. 13. Similarly, Plaintiff Manzano, LLC, ("Manzano") is an independent explorer and developer of oil and gas resources in New Mexico and is a federal lessee and operator on approximately 5,160 acres located within the Secretarial Area. *Id.* ¶ 12.

Plaintiffs challenge the legality of the 2012 Order, arguing that, in issuing the 2012 Order, the Interior and Bureau of Land Management ("BLM") failed to comply with their statutory obligations under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, *et seq.*; the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181, *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*; the Regulatory Flexibility Act

("RFA"), 5 U.S.C. §§ 601-612; the Sunshine Act, 5 U.S.C. § 552b; and the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 2.  *Id.* ¶¶ 1, 3, 8.  Plaintiffs assert that the 2012 Order negatively affects valid existing oil and gas leases, unlawfully cedes to the potash industry BLM's statutory duties under the FLPMA and MLA to manage the Secretarial Area and regulate valid existing oil and gas leases, and grants a disproportionate amount of power to the potash lessees who may veto certain oil and gas development within the Secretarial Area.  *Id.* ¶¶ 5-6, 58-60.

## II.    FACTUAL BACKGROUND

### A.    1986 Order

The 1986 Order established a policy of protecting correlative rights of oil and gas and potash lessees and operators.  *Id.* ¶¶ 64-65.  To promote concurrent oil and gas development, the 1986 Order imposed a stipulation upon potash leases that mining operations cannot "unreasonably interfere with orderly development and production under any oil and gas lease issued for the same lands."  *Id.* ¶ 67 (quoting 1986 Order, § III.C.).  The 1986 Order also contained stipulations for oil and gas leases to prevent "undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash."  *Id.* ¶ 68 (quoting 1986 Order, Section III.B.).

### B.    Proposed 2012 Order

In early 2011, BLM formed the Joint Industry Technical Committee ("JITC") to provide advice to BLM on technical issues related to the 1986 Order.  *Id.* ¶ 70.  The JITC included 10 oil and gas companies and two potash producers.  *Id.* ¶ 71.  In January 2012, former Secretary of Interior Kenneth L. Salazar ("former Secretary") re-directed the purpose of the JITC to consult on a new order ("Proposed 2012 Order") to replace the 1986 Order.  *Id.* ¶ 72.  BLM, however,

did not invite additional operators within the Secretarial Area to participate on the re-directed JITC, and expressly denied Plaintiff Strata the opportunity to participate. *Id.* ¶ 74.  BLM did not provide notice to the public of the JITC meetings, or afford the public, including small oil and gas operators, the opportunity to participate in the JITC or otherwise develop the Proposed 2012 Order. *Id.* ¶¶ 75-77.  The JITC regularly met at BLM's office in Carlsbad and included senior BLM personnel, the meetings of which were not open to the public. *Id.* ¶ 78.

The JITC drafted a "Consensus Document" in response to the former Secretary's directive, which sought to (a) preserve the Secretary's 1986 Order; (b) preserve the legal precedent interpreting the 1986 Order; and (c) provide a mandate that BLM approve Drilling Islands and Development Areas in areas with commercial potash to allow for effective development of valid existing oil and gas leases. *Id.* ¶ 79.  In April 2012, the JITC provided the Consensus Document to the former Secretary. *Id.* ¶ 80.

In June 2012, BLM issued an Environmental Assessment ("2012 EA") on the proposed revisions of the 1986 Order. *See id.* ¶ 110.  BLM did not provide a draft 2012 EA to the public for comment, did not analyze any proposed alternatives in the EA, and did not analyze the economic impact upon small businesses in the 2012 EA. *See id.* ¶¶ 115-121.

On July 13, 2012, the Proposed 2012 Order was published in the Federal Register and made available for public comment. *Id.* ¶¶ 81-82.  BLM did not hold any public meetings on the Proposed 2012 Order, did not conduct any analysis under NEPA in drafting the Proposed 2012 Order, did not issue an initial or final draft regulatory flexibility analysis discussing impacts of the 2012 Order on small businesses, and did not coordinate with state or local governments in developing the Proposed 2012 Order. *See id.* ¶¶ 83-85, 106-108.

C.     **The 2012 Order**

The former Secretary signed the 2012 Order on December 3, 2012, without first issuing a Decision Record or Finding of No Significant Impact ("FONSI") for the 2012 EA.  *See id.* ¶ 111; 2012 Order 12, ECF No. 13-1.  On December 4, 2012, BLM published the 2012 Order in the Federal Register.  Am. Compl. ¶ 87, ECF No. 13.  The 2012 Order applies to all existing oil and gas leases in the Secretarial Area "in conformity with lease stipulations and Federal law."  2012 Order § 7(a), ECF No. 13-1.  The 2012 Order expressly states that it "will not affect the current status of lands with respect to their being withdrawn from or open to entry or leasing."  *Id.* § 5. The 2012 Order directs BLM to develop guidelines consistent with the Order for establishing Development Areas and Drilling Islands.  *Id.* § 7(e).[1]

The 2012 Order contains guidelines for the issuance of oil and gas leases, requiring applicants, as a condition to the issuance of a lease, to execute a stipulation as follows:

> (1)     Drilling for oil and gas shall be permitted only in the event that the lessee establishes to the satisfaction of the Authorized Officer, BLM, that such drilling will not interfere with the mining and recovery of potash deposits, or the interest of the United States will best be served by permitting such drilling.
>
> (2)     No wells shall be drilled for oil or gas at a location which, in the opinion of the Authorized Officer, would result in undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash deposits.
>
> (3)     When the Authorized Officer determines that unitization is necessary for orderly oil and gas development and proper protection of potash deposits, no well shall be drilled for oil or gas except pursuant to a unit plan approved by the Authorized Officer.

*Id.* § 6(a)(1)-(3).[2]  BLM must impose the same stipulations for the issuance of oil and gas leases

---

[1] A "Development Area" is a BLM-established area within the Secretarial Area "in consideration of appropriate oil and gas technology such that wells can be drilled from a Drilling Island capable of effectively extracting oil and gas resources while managing the impact on potash resources."  2012 Order § 4(f), ECF No. 13-1.  "Drilling Island" is defined as an "area established by the BLM, usually associated with and within a Development Area, from which all new drilling of vertical, directional, or horizontal wells that newly penetrate the potash formations can be performed in order to support the development of oil and gas resources."  *Id.* § 4(g).

[2] An "Authorized Officer" is defined as any BLM employee "authorized to perform duties described in 43 CFR Parts 3000, 3100, and 3500, as delegated in the BLM Manual."  2012 Order § 4(a), ECF No. 13-1.

as a condition to granting any discretionary reinstatement or renewal of any existing lease.  *See id.* § 6(b).

The 2012 Order also provides guidance for how BLM processes Applications for Permits to Drill ("Drilling Applications" or "APDs") within the Secretarial Area.  *See id.* § 6(e).  Of relevance here, the 2012 Order states:

> It is the policy of the Department of the Interior to deny approval of most applications for permits to drill oil and gas wells from surface locations within the [Secretarial Area].  Three exceptions to this policy will be permitted if the drilling will occur under the following conditions from:
>
> (a)  a Drilling Island associated with a Development Area established under this Order or a Drilling Island established under a prior Order;
>
> (b)  a Barren Area and the Authorized Officer determines that such operations will not adversely affect active or planned potash mining operations in the immediate vicinity of the proposed drill-site; or
>
> (c)  a Drilling Island, not covered by (a) above, or single well site established under this Order by the approval and in the sole discretion of the Authorized Officer, provided that such site was jointly recommended to the Authorized Officer by the oil and gas lessee(s) and the nearest potash lessee(s).

*Id.* § 6(e)(1).[3]

The 2012 Order gives BLM discretion to establish Development Areas.  *See id.* § 6(e)(2).  Under the Order, the Authorized Officer is to determine the appropriate designation of a Development Area in terms of location, shape, and size; and in most cases, a single Drilling Island will be established for each Development Area.  *Id.* § 6(e)(2)(d).  The 2012 Order establishes ¼ mile buffer zones for oil wells and ½ mile buffer zones for gas wells, until the BLM Director or other delegated official revises such distances based on scientific evidence.  *See id.* § 6(e)(3).  BLM, however, "may adjust the Buffer Zones in an individual case, when the

---

[3] A "Barren Area" is a BLM-established area within the Secretarial Area "for which sufficient data is available to establish a lack of potash mineralization in sufficient thickness and quality to be mineable under existing technology and economics."  2012 Order § 4(b), ECF No. 13-1.

facts and circumstances demonstrate that such adjustment would enhance conservation and would not compromise safety."  *Id.*  The 2012 Order additionally announced Interior's policy that all federal oil and gas leases "should be unitized or subject to an approved communitization agreement unless there is a compelling reason for another operating system" and that BLM will "include non-Federal mineral rights owners in unit or communitization agreements to the extent possible."  *Id.* § 6(e)(4).

## III.   PROCEDURAL HISTORY

### A.   Plaintiffs' Claims

Plaintiffs generally allege in their Amended Complaint that, "[w]hile the 1986 Order promoted concurrent development of potash and oil and gas, and only protected economically viable potash deposits capable of commercial profitability, the 2012 Order covers the entire Secretarial Area, vastly expanding the scope of prohibiting concurrent development of valid oil and gas leases under the guise of preserving potential potash resources regardless of whether the potash deposits can be commercially and economically developed or not."  Am. Compl. ¶ 91, ECF No. 13.  They also assert that the new process gives BLM unbridled discretion as to whether to issue an APD.  *Id.* ¶ 101.  Plaintiffs allege that the 2012 Order prevents smaller oil and gas companies from developing their lease rights through provisions that may require forced unitization, consolidation of operatorship, and expensive extended horizontal wellbores, the latter of which may not be economic.  *See id.* ¶¶ 95, 103.

Plaintiffs assert eight causes of action in their amended complaint.  In the First Cause of Action, they allege that the 2012 Order is a final agency action that is arbitrary, capricious, and contrary to law under the Administrative Procedure Act ("APA") because it was issued in

violation of the FLPMA, the MLA, NEPA, and the RFA.  *See id.* ¶¶ 126-142.[4]  Plaintiffs contend

that the 2012 Order restricts their surface use and access and prohibits the development of their

valid existing federal oil and gas leases in violation of the MLA.  *Id.* ¶¶ 129, 131.  Plaintiffs

assert that the 2012 Order violates the MLA and FLPMA by unlawfully amending existing

leases, requiring the increased use of horizontal drilling that may not be economic, arbitrarily

requiring the use of the latest technologies, arbitrarily establishing non-scientifically based buffer

zones at the sole discretion of the BLM, potentially forcing unlawful unitization plans on federal

lessees, and shifting the burden on oil and gas lessees to establish that an area is barren of

commercial potash before oil and gas development can proceed.  *See id.* ¶¶ 130-40.  Plaintiffs

allege in their Second Cause of Action that the 2012 Order, in particular the § 6(e)(2)

Development Area provision, the buffer zone restrictions, the unitization provisions, and the

provisions on the utilization of the latest technologies, violates the FLPMA and the MLA by

unlawfully and unilaterally modifying and restricting their ability to develop their existing

federal oil and gas leases.  *See id.* ¶¶ 143-57.

Plaintiffs allege violations of NEPA in their Third and Fourth Causes of Action.  In

Count Three, Plaintiffs contend that Defendants violated NEPA by issuing the 2012 EA

concurrently with the 2012 Order without accepting public comments on it; by failing to analyze

the economic and socioeconomic impact the 2012 Order will have on federal oil and gas royalty

revenue, the State of New Mexico, on jobs and the local economies, and on small oil and gas

companies within the Secretarial Area; and by failing to utilize high quality scientific studies in

developing buffer zone distances and instead relying upon flawed studies regarding gas

migration and subsidence.  *See id.* ¶¶ 158-169.  Plaintiffs allege in Count Four that Defendants

---

[4] The parties agree that the First Cause of Action contains both substantive claims (violations of the FLMPA and the MLA) and procedural claims (violations of NEPA and the RFA).  *See* Defs.' Mot. 15 & n.3, 20 & n.5, ECF No. 29; Pls.' Resp. 14-17, ECF No. 32.

violated NEPA by failing to consider in the 2012 EA a reasonable range of alternatives; instead, BLM only considered two alternatives: (1) maintain the 1986 Order or (2) adopt the proposed 2012 Order. *See id.* ¶¶ 170-181.

In Counts Five and Six, Plaintiffs allege additional procedural violations. Plaintiffs assert in their Fifth Cause of Action that Plaintiffs are small businesses within the meaning of the RFA and that Defendants violated the RFA by failing to analyze the impact the 2012 Order would have on small businesses. *See id.* ¶¶ 182-189. In the Sixth Cause of Action, Plaintiffs contend that the JITC was an advisory committee established by the BLM and the former Secretary to provide advice and management recommendations to them regarding development of the 2012 Order, but that the JITC was not properly created in accordance with the FACA. *See id.* ¶¶ 192, 194-95. Plaintiffs also assert that the JITC meetings were not noticed to or open to the public in violation of the Sunshine Act. *See id.* ¶¶ 191, 193, 198. Plaintiffs contend that the 2012 Order was promulgated after the potash companies, through the JITC, were able to have undue influence over the proceedings. *See id.* ¶¶ 196-97.

Plaintiffs assert additional FLPMA and MLA claims in their Seventh and Eighth Causes. In Count Seven, Plaintiffs allege the 2012 Order is arbitrary and capricious because it cedes to the potash industry the Secretary's and BLM's non-delegable statutory duties under the FLPMA and MLA to manage the Secretarial Area and valid and existing leases. *See id.* ¶¶ 200-09. Plaintiffs contend that the 2012 Order gives potash companies *de facto* regulatory control over valid existing oil and gas leases by granting them veto power over certain APDs. *See id.* ¶¶ 204, 206. Plaintiffs also claim that the Order gives the potash industry unilateral authority to preclude oil and gas drilling by mapping inferred potash resources through the use of well logs that are not scientifically supportable. *See id.* ¶ 208. Lastly, Plaintiffs contend in Count Eight that the 2012

Order is a *de facto* withdrawal of over 100,000 acres from oil and gas development in violation of FLPMA requirements that withdrawals of public lands occur after publication of notice in the Federal Register and report to Congress.  *See id.* ¶¶ 210-20.  Plaintiffs assert that the lands have been effectively withdrawn from oil and gas development because the 2012 Order arbitrarily establishes buffer zones and gives near absolute discretion to the BLM to deny any Drilling Application for any reason, even if the Drilling Application would be in a barren, non-commercial area for potash mineralization.  *See id.* ¶¶ 216-19.

### B.   Defendants' Motion to Dismiss

On October 31, 2013, Defendants filed a Motion to Dismiss (ECF No. 29).  Defendants argue that the entire complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs' claims are not ripe for adjudication.  Alternatively, Defendants move to dismiss Plaintiffs' third and fourth causes of action brought under NEPA and the APA because Plaintiffs are not within NEPA's zone of interests in order to assert those claims.  Defendants additionally argue that Plaintiffs' sixth, seventh, and eighth causes of action failure to state a claim and should be dismissed under Rule 12(b)(6).  Defendants contend that the JITC is not an "advisory committee" within the meaning of the FACA, and thus, Count Six should be dismissed.  Defendants also assert that Count Seven should be dismissed because BLM retains its full discretionary authority under the 2012 Order to establish buffer zones, and thus, it did not delegate government functions to private parties.  Finally, Defendants argue that Plaintiffs fail to state a claim in Count Eight because the 2012 Order does not "withdraw" any lands within the meaning of the FLPMA; rather, the Order regulates how oil and gas development and potash mining is to occur in the Secretarial Area.

### IV.   STANDARD

Under Rule 12(b)(1), a court may dismiss a case for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Whether a claim is ripe for judicial review bears on a court's subject matter jurisdiction under Article III's case or controversy clause of the United States Constitution, and thus, a challenge to the ripeness of a claim is treated as a Rule 12(b)(1) motion. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).  The party invoking federal jurisdiction bears the burden of establishing its existence, including that the party has standing and that the claims are ripe for judicial review.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998); *Gonzales*, 64 F.3d at 1499.

Rule 12(b)(1) motions generally constitute either (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter is based.  *Ruiz v. McDonell*, 299 F.3d 1173, 1180 (10th Cir. 2002). At the pleading stage, general factual allegations of injury may suffice because courts presume that the general allegations embrace the specific facts necessary to support the claim.  *Bennett v. Spear*, 520 U.S. 154, 168 (1997); *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013).  "When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional fact."  *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003) (internal quotations omitted).  A court's reference to such evidence when ruling on a Rule 12(b)(1) motion does not convert the motion to dismiss to a Rule 56 motion for summary judgment.  *Id.*  Although Defendants here have presented a facial attack on the Amended Complaint's allegations, Plaintiffs have submitted a declaration in support of their arguments.  The Court may consider the declaration when ruling on Defendants' Rule 12(b)(1) motion to dismiss.

11

The Court can also dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A plaintiff's complaint must set forth factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It is not enough for a plaintiff to just set forth labels, conclusions, and formulaic recitation of the elements of a cause of action.  *Id.*  When reviewing a plaintiff's complaint in ruling on a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true and view the allegations in the light most favorable to the plaintiff.  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  The Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).  This plausibility standard does not require evidence of probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## V.   STATUTORY FRAMEWORK

### A.   Administrative Procedure Act

Under the APA, "agency action is judicially reviewable in two instances:  when it is 'made reviewable by statute' and when it constitutes 'final agency action for which there is no other adequate remedy in a court.'"  *United Tribe of Shawnee Indians v. U.S.*, 253 F.3d 543, 549 (10th Cir. 2001) (quoting 5 U.S.C. § 704).  Regarding the finality requirement, the Supreme Court explained:

> [a]s a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process, —it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). A court will not overturn an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting 5 U.S.C. § 706(2)(a)).

### B.     Federal Land Planning and Management Act

The FLPMA sets forth standards for the BLM's management of "public lands," which are lands owned by the United States and administered by the Secretary of the Interior through the BLM. *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 737 & n.1 (10th Cir. 1982). The FLPMA directs the government to manage public lands for multiple uses and sustained yield, in accordance with applicable land use plans. 43 U.S.C. § 1732(a). Under the FLPMA, "Congress provided that the BLM should manage the public lands by using the Act's procedures in a dynamic, evolving manner to accommodate [] competing demands." *Rocky Mountain*, 696 F.2d at 738. Consequently, under the FLPMA, the BLM need not permit all resource uses on a given parcel of land, if it would be inappropriate to do so. *See N.M. ex rel. Richardson*, 565 F.3d at 710; *Rocky Mountain*, 696 F.2d at 738.

Under the FLPMA, the Secretary may make withdrawals of public lands in accordance with the provisions and limitations of 43 U.S.C. § 1714, including publication of a notice in the Federal Register. *See* 43 U.S.C. § 1714. "Withdrawal" means "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . . ." 43 U.S.C. § 1702(j). The Secretary must report to Congress any management decision that totally eliminates one or more

of the principal or major uses for two or more years with respect to a tract of land of 100,000 acres or more and allow for congressional review of the action.  *See* 43 U.S.C. § 1712(e)(2).

## C.    Mineral Leasing Act

The Mineral Leasing Act of 1920, as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, gives the Secretary of Interior broad discretion to determine which lands will be leased.  *See Udall v. Tallman*, 380 U.S. 1, 4 (1965); *Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).  The Department of Interior uses a three-phase decision-making process to manage the use of federal oil and gas resources.  *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).  At the earliest and broadest level of decision-making, Interior develops land use plans, which describes for a particular area allowable uses, goals for future condition of the land, and specific next steps.  *Id.*  The land use plans specify which areas will be considered for oil and gas development and what conditions will be placed on such development.  *Western Energy Alliance*, 709 F.3d at 1043.  Once a land-use plan has issued, subsequent more detailed planning must conform to the land-use plan. *Pennaco Energy*, 377 F.3d at 1151 (quoting 43 C.F.R. § 1610.5-3(a)).  The authority of the BLM to take actions in accordance with a plan, however, is "subject to valid existing rights."  *See* 43 C.F.R. § 1610.5-3(b).

In the second phase, the BLM must determine whether the issuance of a particular oil and gas lease is consistent with the land-use plan.  *See Western Energy Alliance*, 709 F.3d at 1043. The BLM decides which parcels of land will be leased through the competitive bidding process. See, e.g., 43 C.F.R. § 3120.1-1.  For lands determined to be available for oil and gas development under the land use plan, "the BLM field office conducts an interdisciplinary team review of the parcels, focusing on conflicts with wildlife, habitat, wilderness, land

characteristics, planning and other resource values." *Western Energy Alliance*, 709 F.3d at 1043.

The team also undertakes a NEPA evaluation. *See id.* "These pre-leasing review processes can

result in parcel rejections, deferrals, and/or stipulations being placed on the leases." *Id.* (citing

43 C.F.R. § 3101.1-3).

Finally, in the third phase, the lessee must obtain BLM approval of an Application for

Permit to Drill before commencing any drilling operations. *See Pennaco Energy*, 377 F.3d at

1151-52 (quoting 43 C.F.R. § 3162.3-1(c)). The Secretary may only grant a permit to drill after

analysis and approval of a plan of operations covering proposed surface disturbing activities

within the lease area. 30 U.S.C. § 226(g). The MLA sets forth the process for the BLM to

assess and approve or deny an APD. *See* 30 U.S.C. § 226(p). The MLA also permits federal

lessees to jointly develop their leases as a unit whenever the Secretary determines unitization to

be necessary or advisable in the public interest. *See* 30 U.S.C. § 226(m).

### D.     National Environmental Policy Act

NEPA prescribes the necessary process by which federal agencies must examine the

environmental effects of proposed federal actions and inform the public of the environmental

concerns that went into the agency's decision-making. *See Baltimore Gas and Elec. Co. v.*

*Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *Pennaco Energy*, 377 F.3d at 1150. NEPA

does not impose substantive limits on agency conduct or encourage a particular substantive

decision; rather, NEPA imposes only procedural requirements to insure a fully informed and

well-considered decision. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.*

*Council*, 435 U.S. 519, 558 (1978); *Pennaco Energy*, 377 F.3d at 1150. An agency must take a

"hard look" at the environmental consequences before taking a major action. *Baltimore Gas*,

462 U.S. at 97.

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide: "When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." 40 C.F.R. § 1508.14. NEPA regulations define "effects" to include "ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. In an EIS, federal agencies must also include a detailed statement on "alternatives to the proposed action." *See* 42 U.S.C. § 4332(C)(iii). An agency does not need to conduct a comprehensive EIS if an environmental assessment ("EA") shows that the proposed action would not have a significant effect on the environment. *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) (citing 40 C.F.R. §§ 1501.4, 1508.9).

### E.      The Federal Advisory Committee Act and the Sunshine Act

Congress enacted FACA to monitor and control the number of advisory committees established to advise officers and agencies. *See* 5 U.S.C. app. 2 § 2. FACA places a number of requirements on advisory committees, including giving advance notice of meetings in the Federal Register, generally holding open meetings, being fairly balanced in terms of the points of view represented, and not being inappropriately influenced by the appointing authority or any special interest. *Miccosukee Tribe of Indians of Florida v. Southern Everglades Restoration Alliance*, 304 F.3d 1076, 1082 (11th Cir. 2002) (quoting 5 U.S.C. App. 2 §§ 5, 9, 10). The Sunshine Act similarly requires, subject to certain exceptions not relevant here, that "every portion of every meeting of an agency shall be open to public observation" where that meeting is

to conduct or dispose of agency business.  5 U.S.C. § 552b(b).  FACA also provides:  "No advisory committee shall be established unless such establishment is – (1) specifically authorized by statute or by the President; or (2) determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. app. 2 § 9(a).

> ### F.     Regulatory Flexibility Act

The RFA mandates that, whenever an agency is required by section 553 of the APA to publish general notice of proposed rulemaking, the agency must prepare and make available for public comment an initial regulatory flexibility analysis that describes the impact of the proposed rule on small businesses.  5 U.S.C. §§ 601(6), 603(a).  The analysis must include a description of any significant alternatives to the proposed rule that accomplish the stated objectives of applicable statutes and that minimize any significant economic impact of the proposed rule on small entities.  *Id.* § 603(c).  When an agency promulgates a final rule, the agency must prepare a final regulatory flexibility analysis, which it must make available to the public and publish in the Federal Register.  *Id.* § 604(a)-(b).

## VI.     ANALYSIS

> ### A.     Ripeness

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations omitted).  The doctrine of ripeness is premised on justiciability and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the

agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (citations omitted).  *See also Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").  A substantive rule that as a practical matter requires a plaintiff to adjust his conduct immediately is nonetheless an agency action ripe for review at once. *Lujan*, 497 U.S. at 891.

When determining whether an administrative action is ripe for judicial review, a court should evaluate the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  *National Park Hospitality*, 538 U.S. at 808.  In doing so, the court may consider:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*Palma*, 707 F.3d at 1158.[5]  Ordinarily the inquiry depends on whether the plaintiff's challenge is to a "final agency action."  *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088,

---

[5] The Tenth Circuit sometimes utilizes a three-factor test in its ripeness review.  *See*, *e.g.*, *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1192 (2008) ("Our analysis accounts for three factors:  1) whether delayed review would cause hardship to the plaintiffs; 2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented.") (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).  The Tenth Circuit has repeatedly stated that the "two tests are essentially the same."  *Palma*, 707 F.3d at 1158 n.10.

1093-94 (10th Cir. 2004).   Nevertheless, even where the question presented is a legal one and constitutes "final agency action" within the meaning of Section 10 of the APA, a claim may not be ripe where further factual development of the record would significantly advance the court's ability to deal with the legal issues presented and judicial resolution should await a concrete dispute.  *See National Park Hospitality Ass'n*, 538 U.S. at 812.  *See also Friends of Marolt Park*, 382 F.3d at 1094 ("Even where an agency action is considered final, however, a claim may not be ripe if there is no direct, immediate effect on plaintiffs.").

### 1.   Substantive Challenges to the 2012 Order

Defendants argue that Plaintiffs' substantive challenges that the 2012 Order violates the MLA and the FLPMA (Counts One, Two, Seven, and Eight) are not ripe for review because Plaintiffs have not alleged that any of their leases have been rejected, rescinded, or denied because of the 2012 Order, or that Drilling Applications have been denied, or that their ongoing oil and gas production activities have been directly affected by the 2012 Order.  Only when the 2012 Order is applied to a specific lease, assert Defendants, will the legality of the Order be clear.  Furthermore, Defendants contend that it is premature to assess whether there has been or could be a *de facto* withdrawal of any federal lands, because the 2012 Order proposes reasonable restrictions on oil and gas development and contemplates that development areas, buffer zones, and unitization requirements will be developed in the future based upon maps submitted by potash lessees.

As for the first factor in the ripeness analysis, issues are purely legal when the parties challenge a rule generally rather than its application to a specific set of facts.  *CSG Exploration Co. v. F.E.R.C.*, 930 F.2d 1477, 1484 (10th Cir. 1991).  Plaintiffs have predominantly challenged the 2012 Order generally, arguing that its provisions on unitization, buffer zones, and

development areas violate the MLA and FLMPA.  This factor thus weighs in favor of a finding of ripenesss.

With respect to the second factor, the 2012 Order is a "final order" under the APA.  The 2012 Order was promulgated after public notice and evaluation of submitted comments, and the Department of Interior published it in the Federal Register.  Issuance of the 2012 Order marked consummation of the BLM's process of developing its land use plan, and legal rights flow from that decision because subsequent more detailed planning by the BLM must conform to the plan. *See* 43 C.F.R. § 1610.5-3.   Although the BLM may issue APDs and prepare additional environmental analyses in the context of specific APDs, those more specific actions do not mean that the promulgation of the more general policies set forth in the 2012 Order does not also constitute a final agency action.  *Cf. Bennett*, 520 U.S. at 178 (holding that issuance of biological opinion proposing use of reservoir water to protect endangered fish constituted "final agency action" under APA, even though agency had some discretion to determine actual allocation of water); *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-151 (1967) (holding that regulation, which was promulgated in formal manner after announcement in Federal Register and consideration of comments by interested parties was "final agency action" under APA because it was definitive and compliance was expected), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 247-48 (3d Cir. 2011) (holding that Forest Service's statement was "final agency action," even though other EISs and notices to proceed would be completed as to specific drilling requests that would also constitute "final agency action," because statement represented consummation of Service's decision-making process on question of whether to issue notices to proceed while Service conducted lengthy EIS). Consequently, the second factor also weighs in favor of a finding of ripeness.

The third factor requires the court to consider whether the 2012 Order has or will have a direct and immediate impact on Plaintiffs.  Unlike the cases relied upon by Defendants, Plaintiffs here have submitted evidence of tangible, concrete injury that they have already incurred after the promulgation of the 2012 Order:  (i) BLM has discouraged the filing of notices of stakings and APDs for numerous locations; (ii) BLM explicitly rejected their earlier-proposed location for Well 18H within the Forty Niner Ridge Unit of the Secretarial Area because of an objection to the surface location by a potash lessee with interests in the area; (iii) BLM rejected other alternatives to the rejected location because of more objections by the same potash lessee; (iv) because of these objections, BLM is requiring Strata to drill within the Forty Niner Ridge Unit solely through the use of drilling islands selected by agreement between BLM, other surface owners, and potash lessees without input of the affected oil and gas operators, including Strata; (v) by requiring Strata to drill through islands, BLM has significantly increased Strata's drilling costs and removed from production oil and gas resources that are inaccessible from the drilling islands; (vi) BLM has required Strata to drill four wells from a single drill island for its Gavilon Development, despite agreeing previously to allow four individual pads, again increasing Strata's costs of development; and (vii) BLM effectively denied Strata's re-entry request for an abandoned well for production of Delaware oil reserves, after BLM informed Strata that re-entry would not be well received by the potash companies.  Decl. of Mitchell Krakauskas ¶¶ 5-13, ECF No. 32-1.  Plaintiffs have thus provided evidence that the 2012 Order is currently affecting the operations and development of their leases and increasing their exploration, development, and overall operating costs.  *Cf. Rocky Mountain*, 696 F.2d at 742 ("[E]vidence throughout the record demonstrates harm sustained by RMOGA's members as a result of investment decisions forced upon them by Interior's policy, and by Interior's actual *and constructive rejection of*

*APDs*. Indeed, the district court found that RMOGA's members have suffered '[i]rreparable financial harm . . . through the implementation of the Solicitor's opinion and ensuing regulations because of the loss of monies previously invested and the halting of oil and gas exploration and development.' This clearly amounts to a factual finding of financial harm suffered by RMOGA's members.") (Emphasis added and internal citation omitted). Because Plaintiffs have shown evidence that BLM is constructively rejecting their proposed APDs, they have demonstrated direct, immediate harm arising from the BLM's implementation of the 2012 Order sufficient to satisfy the third factor in the ripeness analysis.

Finally, resolution of the issues now would not greatly interfere with further administrative actions by BLM, as the 2012 Order is a final, published agency rule. *Cf. Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2010) (holding that substantive and procedural challenges to BLM regulations published in federal register, but not yet applied by BLM, were ripe for review because actions were final and dispute would not interfere with further administrative action). The fourth factor also weighs in Plaintiffs' favor.

In sum, the issues in this case are primarily legal challenges to a final agency action, and thus, fit for judicial decision. Moreover, Plaintiffs have demonstrated that BLM has already begun implementation of the 2012 Order in a manner that is causing them to suffer harm that is concrete enough not to need to await the final, formal processing of a specific APD. BLM's site-specific actions present the Court with a factual record on which to focus the general legal challenges. While further site-specific administration may have brought even greater clarity to the record, that potential negative consequence for Plaintiffs' case may become evident during the summary judgment or trial phase. Nevertheless, for purposes of the ripeness analysis, Plaintiffs have met their burden of showing that their substantive claims are ripe for adjudication.

### 2.      Procedural Challenges to the 2012 Order

Defendants additionally assert that Plaintiffs' procedural challenges (Counts One, Three, Four, Five, and Six) are not ripe because the challenged decision has no immediate impact on the interests Plaintiffs seek to protect and delay in review would not harm them.  Defendants also contend that, because the 2012 Order is interlocutory in nature and does not determine Plaintiffs' rights or obligations, Plaintiffs are not challenging final agency action and their procedural challenges are not ripe for review.  For the reasons discussed *supra*, the Court has already determined that Plaintiffs have shown an immediate impact on their interests stemming from the 2012 Order.  This Court has also rejected Defendants' contention that the 2012 Order does not constitute "final agency action."

Moreover, a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).  Unlike a claim concerning a substantive challenge to an agency action, a claim that an agency violated NEPA's procedural requirements "becomes ripe when the alleged procedural violation occurs, assuming the plaintiff has standing to bring the claim."  *Friends of Marolt Park*, 382 F.3d at 1095.[6] "Standing requires an injury in fact that is fairly traceable to the challenged action and is likely to be redressed by judicial intervention."  *Id.*

Here, the alleged procedural violations have already occurred, and thus these claims do not need further development of the factual record for the Court to determine their merits.

---

[6] Defendants rely on the cases of *Palma* and *Public Lands Council v. Babbitt*, 167 F.3d 1287 (10th Cir. 1999), to support their position that the procedural claims are not ripe until the 2012 Order has been actually applied to Plaintiffs' leases.  In *Palma* and *Public Lands Council*, however, the Tenth Circuit did not specifically address the ripeness of Plaintiffs' procedural claims or otherwise distinguish the analysis between substantive and procedural claims.  The Court thus finds the *Palma* and *Public Lands Council* cases to be of limited utility.  Instead, the Court will apply the analysis set forth in *Friends of Marlot Park*, which the Tenth Circuit expressly stated was the test for determining the ripeness of a plaintiff's procedural claims.

Defendants also do not challenge Plaintiffs' Article III standing.  Defs.' Reply 8, ECF No. 35 ("Defendants' motion does not raise Article III standing arguments.  Prudential standing is distinct from Article III standing.").  Instead, Defendants argue that Plaintiffs' NEPA claim is not ripe because Plaintiffs' purely economic injuries do not fall within the "zone of interests" protected by NEPA, and thus, Plaintiffs do not have prudential standing to assert their NEPA claims.  The Supreme Court recently held, however, that this zone-of-interests analysis is not a matter of prudential standing, but rather, "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S.Ct. 1377, 1387 (2014).  In other words, the question is whether Plaintiffs fall within the class of plaintiffs whom Congress has authorized to sue under the substantive statute.  *See id.*

After the Supreme Court decided *Lexmark*, Defendants filed a supplemental notice of authority and requested that this Court convert their motion to dismiss the NEPA claims for lack of subject matter jurisdiction under Rule 12(b)(1) to one for failure to state a claim under Rule 12(b)(6).  *See* Defs.' Notice, ECF No. 37.  Given that Defendants no longer argue that Plaintiffs lack standing, the Court finds that Plaintiffs' claims that BLM violated NEPA's procedural requirements became ripe for review at the time of the alleged procedural failures.  *See Friends of Marolt Park*, 382 F.3d at 1095.  The Court will accordingly analyze *infra* Defendants' remaining arguments that Plaintiffs do not fall within NEPA's zone of interests under Rule 12(b)(6).

Plaintiffs' claims for procedural violations under the FACA, the Sunshine Act, and the RFA are similarly ripe at the time of the alleged failure to conduct the requisite procedures,

24

assuming that Plaintiffs have standing.  *Cf. National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1286 (D.C. Cir. 2005) ("Thus, as with a NEPA challenge, the appellants may complain of the Corps' alleged failure to comply with the procedures set forth in sections 604 and 605 of the RFA at the time the alleged failure occurred, *i.e.*, when the Corps issued the [nationwide permits] without complying with those procedures. In sum, the appellants' RFA challenge can never get riper.") (internal quotations omitted); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1263-64 (10th Cir. 2002) (explaining that challenge to failure of agency to comply with NEPA procedures becomes ripe at time failure takes place, assuming plaintiff has standing to bring claim, and there was no reason why procedural challenge to failure of federal agency to comply with Endangered Species Act's procedures should not be treated in same manner).  Again, because Defendants do not contest Plaintiffs' standing in this case, Plaintiffs' procedural claims are ripe for review.

### B.      Failure to State a NEPA Claim (Counts 3 and 4)[7]

Under the APA, "a plaintiff must establish it is 'adversely affected or aggrieved . . . within the meaning of a relevant statute' by some final agency action." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996).  To be adversely affected within the meaning of NEPA, a plaintiff must show it suffered an injury in fact falling within the "zone of interests" protected by NEPA.  *Id.*  The "zone of interests" test "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives."  *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 397 n.12 (1987).

---

[7] Defendants argue that Plaintiffs' Third and Fourth Causes of Action under NEPA should be dismissed under the zone-of-interests test.  Plaintiffs' First Cause of Action also alleges, among other violations, a violation of NEPA.  Although Defendant does not specifically assert that the NEPA claim in the First Cause of Action should likewise be dismissed, the Court concludes that the following analysis applies to all asserted NEPA claims.

Defendants argue that Plaintiffs' NEPA claims should be dismissed because purely economic injuries do not fall within the "zone of interests" protected by NEPA. Plaintiffs respond that they pled economic and safety interests and cited violations of numerous provisions of NEPA that show Congress's intent to protect and consider such economic and safety interests. In Counts Three and Four, Plaintiffs allege that the 2012 Order violates NEPA because BLM failed to consider "alternatives to the proposed action" in violation of 42 U.S.C. § 4332(C)(iii), and failed to take a "hard look" at socio-economic impacts, cumulative impacts, and high-quality scientific evidence in violation of 42 U.S.C. § 4332(C)(i) and its implementing regulations, including 40 C.F.R. §§ 1500.1, 1502.1, 1502.24, 1508.7, 1508.8, 1508.14, 1508.23, and 1508.25(c). Plaintiffs also allege that the 2012 Order violates NEPA by failing to take a hard look at high quality scientific studies "relevant to safety and concurrent development," and that BLM relied on flawed studies regarding gas migration and subsidence. *See* Am. Compl. ¶¶ 166-68, ECF No. 13. To support their position, Plaintiffs rely on the cases of *Bennett v. Spear*, 520 U.S. 154 (1997), and *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115 (8th Cir. 1999).

In *Bennett*, the petitioners brought suit alleging a violation of Section 7 of the Endangered Species Act ("ESA"), which requires that each agency "use the best scientific and commercial data available." *Bennett*, 520 U.S. at 176 (quoting 16 U.S.C. § 1536(a)(2)). The Supreme Court considered whether petitioners, who sought to vindicate economic rather than environmental interests, had prudential standing to bring suit under the ESA. *See id.* at 161. The Supreme Court applied the zone-of-interest test, which it described as whether the interest sought to be protected by the plaintiff is arguably within the zone of interests to be protected or regulated by the statute in question. *Id.* at 175. The Supreme Court clarified that, when

26

examining the statute, a court must look to the particular provision of law upon which the plaintiff relies, not to the overall purpose of the Act in question. *Id.* at 175-76. Consequently, the Supreme Court rejected examining the overall purpose of the ESA – species preservation – when determining whether petitioners' claims fell within the ESA's zone-of-interests. *See id.* at 175-76. Instead, the Supreme Court determined that one of the objectives of the "best scientific and commercial data" requirement "is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives" and to prevent uneconomic, erroneous jeopardy determinations. *Id.* at 176-77. The Court thus held that petitioners, who were alleged victims of such a mistake and sustained economic injury, fell within the zone of interests that the provision protects. *See id.* at 177. The question here is how to apply *Bennett*'s reasoning to the particular NEPA provisions relied upon by Plaintiffs.

The overall purpose of NEPA is to protect the environment and advance human health and welfare. *See* 42 U.S.C. § 4321; *Committee to Save the Rio Hondo*, 102 F.3d at 448 (stating that NEPA "was enacted to protect and promote environmental quality"). A number of circuits have held that economic injury alone does not fall within NEPA's zone of interests. *See Latin Americans for Social and Economic Development v. Administrator of Federal Highway Admin.*, __ F.3d __, 2014 WL 2782011, at *15 (6th Cir. June 20, 2014); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 944 (9th Cir. 2005); *Taubman Realty Group Ltd. Partnership v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003); *ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n*, 205 F.3d 403, 408 (D.C. Cir. 2000).

A circuit split emerged, however, when the Eighth Circuit, in applying *Bennett*'s analysis, determined that particular NEPA provisions governing the preparation of an EIS evinced a concern for economic interests. *See Dombeck*, 164 F.3d at 1125-26. In *Dombeck*, plaintiffs, a

group of counties, concerned citizens, and outfitters, all with economic concerns, challenged the

Forest Service's wilderness plan that restricted visitor and motorboat use. *See id.* at 1119-20.

The plaintiffs claimed they had standing because the final EIS failed to consider adequately the

economic impact on local economies and was based on flawed data or an incomplete analysis of

alternative plans. *Id.* at 1126. The Eighth Circuit concluded that the plaintiffs had prudential

standing to assert their NEPA claims because the NEPA provisions and implementing

regulations at issue indicated that social and economic effects of proposed agency action must be

considered in the preparation of an EIS. *See id.* at 1125-26.

    In *Central South Dakota Co-op. Grazing Dist. v. Sec'y of the U.S. Dep't of Agriculture*,

266 F.3d 889 (2001), however, the Eighth Circuit limited the breadth of *Dombeck*'s holding:

> Economic interests alone are "clearly not within the zone of interests to be
> protected by [NEPA]." However, even though NEPA's procedures are not
> implicated unless a plaintiff has an environmental injury at stake, once those
> procedures have been invoked, a plaintiff can assert an injury arising from the
> agency's failure to consider NEPA's particular purpose or provisions, which
> might include economic considerations. . . .
>
> Here, the Grazing District argues that 42 U.S.C. §§ 4332(2)(C) and 4331(a), along
> with *Dombeck*, provide for protection of economic interests. The Grazing District
> ignores that in this matter, the Forest Service issued a FONSI and therefore no
> EIS was prepared, which is of central import to section 4332(2)(C) and to
> *Dombeck*. . . .
>
> The Grazing District relies on a NEPA provision that requires all federal agencies
> to "study, develop, and describe appropriate alternatives to recommended courses
> of action in any proposal which involves unresolved conflicts concerning
> alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This provision
> requires agencies to consider alternatives to proposals where an EIS is not
> required, but unlike considerations within an EIS, does not specifically consider
> the human environment. . . .
>
> Based on the statutory structure and language, the manifest purpose of section
> 4332(2)(E) is to require federal agencies to consider environmentally sound
> alternatives to proposed actions without reference to the human environment and,
> thus, to economic interests. This impels us back to the position . . . that an

economic injury is an insufficient basis for prudential standing within the meaning of NEPA.

*Id.* at 895-96 (internal citations omitted).

Consequently, even the Eighth Circuit has concluded that purely economic interests are not within the zone of interests protected by NEPA where the agency did not issue an EIS. Moreover, both the Ninth Circuit and District of Columbia have expressly rejected the reasoning of *Dombeck*. *See Ashley Creek*, 420 F.3d at 943-44 (holding that NEPA provisions governing preparation of an EIS "are infused with environmental considerations, leaving no room for economic interests divorced from the environment," and thus, a plaintiff with purely economic interests does not fall within zone of interests within any provision of NEPA); *Town of Stratford v. F.A.A.*, 285 F.3d 84, 88-89 (D.C. Cir. 2002) ("We do not see how any agency regulation implementing a statute could extend prudential standing beyond the class of persons Congress intends, but, in any event, we do not read the CEQ regulation [40 C.F.R. § 1508.14, relied upon by the Eighth Circuit in *Dombeck*] as purporting to extend prudential standing. It does indicate that when economic and social effects are interrelated with natural and physical environmental effects the EIS will "discuss" all of these effects, but it does not require government agencies to take economic effects into account.").

The Tenth Circuit has not directly addressed this issue, although its cases on Article III standing suggest that it would require a plaintiff to allege an environmental interest in order to assert a NEPA claim. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012) (holding that petitioner had not shown an injury-in-fact for purpose of Article III standing under NEPA because they had not alleged environmental harm from agency's alleged failure to follow NEPA procedures); *Catron County Board of Commissioners v. United States Fish and Wildlife Service*, 75 F.3d 1429, 1433 (10th Cir. 1996) ("The County's claim of flood damage to

its property constitutes a threatened or imminent injury to a concrete and particularized legally protected interest. These injuries are perceptible and environmental, not merely speculative or purely economic, and fall well within the zone of interests protected by NEPA.").

Even if this Court were to follow the reasoning of the Eighth Circuit, as urged by Plaintiffs, Plaintiffs have not demonstrated that they fall within NEPA's zone of interests.  As in *Central South Dakota Co-op*, the case here involves only the preparation of an EA, not an EIS. Plaintiffs have nevertheless relied upon NEPA statutory provisions governing preparation of an EIS.   *See* Am. Compl. ¶ 159 (citing 42 U.S.C. § 4332(C)(i)) and ¶ 171 (citing 42 U.S.C. § 4332(C)(iii)), ECF No. 13.  The NEPA provisions governing an EIS do not aid Plaintiffs in their zone-of-interests analysis where the alleged facts show no EIS was prepared in this case. *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1039 (8th Cir. 2002) ("[T]his case involves the preparation of an EA and issuance of a FONSI.  No EIS was prepared.  Consequently, Sun Prairie's economic interests were never considered and do not fall within NEPA's zone of interests. . . . Our review of NEPA has failed to uncover any provisions, aside from those governing preparation of an EIS, which would support a claim motivated by purely economic interests.").  Plaintiffs have not cited any NEPA statutory provisions regarding preparation of an EA or explained how those EA provisions implicate purely economic or safety concerns. Similarly, most of the regulations Plaintiffs rely upon involve the preparation of an EIS, and are inapplicable.   Even if some of the cited regulations pertain to preparation of an EA, the regulations themselves cannot extend the zone of interests beyond what Congress intended, as evidenced by the statutory language. *See Town of Stratford*, 285 F.3d at 89.

Plaintiffs also have not alleged any environmental interest that would otherwise bring their claim within NEPA under a mixed-interest theory. *See Monsanto Co. v. Geertson Seed*

*Farms*, 561 U.S. 139, 155-56 (2010) (explaining that, where respondents showed injury with both environmental and economic components, mere fact that respondents sought to avoid certain economic harms did not strip them of prudential standing); *National Helium Corp. v. Morton*, 455 F.2d 650, 655 (10th Cir. 1971) (holding that plaintiffs were not disqualified from seeking to advance NEPA claim merely because they were not primarily devoted to ecological improvement).  Plaintiffs point to allegations involving the safety of buffer zones and concurrent development, but have not shown how those safety concerns are of an environmental nature. Instead, Plaintiffs cite agency regulations defining "effects," 40 C.F.R. § 1508.8, and "human environment," 40 C.F.R. § 1508.14, that they argue require agencies to consider cumulative economic and social effects upon the human environment.  The term "human environment," however, is used in NEPA regarding the preparation of an EIS.  *See* 42 U.S.C. §§ 4332(2)(C). Again, Plaintiffs have not shown how these regulations are pertinent where the agency has prepared an EA, not an EIS.  Additionally, § 1508.14 states that "economic or social effects are not intended by themselves to require preparation of an [EIS]," and that an agency is to discuss economic or social effects in an EIS when they are "interrelated" with natural or physical environmental effects.  Consequently, Plaintiffs' safety and economic interests are insufficient to fall within NEPA's zone of interests without an additional environmental interest.  *Cf. Taubman*, 320 F.3d at 480-81 (holding that plaintiff's NEPA claim failed zone-of-interests tests where Plaintiffs only alleged economic and safety interests); *Town of Stratford*, 285 F.3d at 89 (stating that § 1508.14 does not require agencies to take economic effects into account; rather, regulation only requires discussion in EIS of economic or social effects when there is an environmental interest).  For all the foregoing reasons, the Court will dismiss under Rule 12(b)(6) Plaintiffs' NEPA claims, as asserted in their First, Third, and Fourth Causes of Action.

C.        **Count Six – Sunshine Act and FACA**

Defendants argue that Count Six should be dismissed for failure to state a claim because the facts alleged do not establish that the JITC is an "advisory committee" within the meaning of FACA.  Defendants assert that, because the JITC is not subject to FACA, it is not subject to the Sunshine Act, which only applies to "agency" meetings.  The parties agree that the relevant statutory definition of "advisory committee" is "any committee . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government. . . ."  5 U.S.C. app. 2 § 3(2)(C).  They disagree, however, as to whether Plaintiffs alleged enough non-conclusory facts that BLM established or utilized the JITC to survive dismissal.

The Supreme Court has interpreted the terms "established" and "utilized" narrowly to prevent FACA from sweeping more broadly than Congress intended.  *Byrd v. U.S. E.P.A.*, 174 F.3d 239, 245 (D.C. Cir. 1999) (citing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452, 461 (1989)).  An advisory committee is "established" if it is actually formed by the agency.  *Id.*  An advisory committee is "utilized" by an agency if it is amenable to strict management by agency officials.  *Id.*  The utilized test is a stringent standard, requiring more than an agency's significant influence over the committee; rather, it requires the agency to actually manage or control the advisory committee.  *See id.* at 246; *Town of Marshfield v. F.A.A.*, 552 F.3d 1, 6 (1st Cir. 2008).

Plaintiffs alleged in their Amended Complaint that BLM formed the JITC to provide advice to BLM on technical issues related to the 1986 Order; that the former Secretary re-directed the purpose of the JITC to consult on the Proposed 2012 Order; that the BLM expressly denied Strata the opportunity to participate on the JITC; that the JITC regularly met at the

BLM's office in Carslbad, New Mexico; and that senior BLM personnel participated in the meetings. *See* Am. Compl. ¶¶ 70-78, ECF No. 13.  The Amended Complaint suggests that BLM invited the oil and gas and potash operators who served on the JITC.  *See id.* ¶¶ 70, 74.  These factual allegations, viewed in the light most favorable to Plaintiff, are sufficient to state a claim that BLM established or utilized the JITC within the meaning of FACA.  *Cf. Miccosukee Tribe*, 304 F.3d at 1082-83 (holding that plaintiff alleged sufficient facts under Rule 12(b)(6) that alliance was advisory committee under FACA where complaint alleged that alliance was entity with federal, state, and other member agencies that was organized by federal defendants in interest of obtaining advice and recommendations regarding their implementation of federal programs in Everglades and the federal defendants obtained such advice from it).

Defendants nonetheless argue that the allegations in the Amended Complaint that the JITC's "Consensus Document" differed from the final 2012 Order that the BLM adopted negates Plaintiffs' conclusory allegations that BLM controlled or managed the JITC.  The Court disagrees that BLM's failure to adhere to all the JITC's recommendations is definitive proof that the BLM did not establish or utilize the JITC.  As additional evidence that BLM did not establish or utilize the JITC, Defendants cite to news reports and § 4(j) of the 2012 Order, the latter of which defines the JITC as a committee established by and subject to the management and control of the potash and oil and gas industries.  *See* 2012 Order § 4(j), ECF No. 13-1.  A court may not properly consider unsupported hearsay in news reports at this stage of the litigation.  Although this Court may consider the contents of the 2012 Order, which is attached to and central to the issues in the Amended Complaint, the Court finds that, while § 4(j) is relevant evidence on the issue of whether the JITC is an advisory committee, it is not definitive evidence and resolution of this factual issue is better left for summary judgment or trial.  The Court will therefore deny

33

Defendants' request to dismiss under Rule 12(b)(6) Plaintiffs' Sixth Cause of Action.

**D.     Unlawful Sub-Delegation Claim (Count Seven)**[8]

Generally, when Congress has vested an agency with the authority to administer a statute, the agency may not shift that responsibility to a private actor, particularly a private actor whose objectivity may be questioned due to a conflict of interest. *See Perot v. Federal Election Comm'n*, 97 F.3d 553, 559 (D.C. Cir. 1996); *Sierra Club v. Sigler*, 695 F.2d 957, 963 n.3 (5th Cir. 1983). An agency, however, has not engaged in unlawful sub-delegation if it retains final reviewing authority over the private party's actions. *See National Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 737 F.2d 1095, 1144 (D.C. Cir. 1984); *Stanton*, 54 F. Supp. 2d at 19; *see also Assiniboine and Sioux Tribes v. Bd of Oil & Gas Conservation*, 792 F.2d 782, 795 (9th Cir. 1986) (holding that the agency must engage in "meaningful independent review" of private action).

Plaintiffs contend that they have stated an unlawful delegation claim because the 2012 Order by its terms announces a policy to deny approval of most APDs, but allows approval under § 6(e)(1)(c) if the nearest potash lessee allows. Plaintiffs allege that the Secretary unlawfully delegated governmental authority by granting potash lessees a *de facto* veto power over certain APDs. Am. Compl. ¶ 204, ECF No. 13.

This Court agrees with Defendants that the language of the 2012 Order affirms that BLM retains considerable discretionary authority to establish buffer zones, establish drilling islands, establish development areas, require unitization and communitization agreements, and to perform rulemaking and issue orders. The fact that the § 6(e)(1)(c) exception applies only where there is a joint recommendation of a drilling island or single well site by the oil and gas lessee

---

[8] Although the parties refer to this claim as an unlawful delegation claim, in reality it is a "sub-delegation" claim. Congress originally delegated the authority to the agency, so the challenged delegation from the agency to the third party is a sub-delegation. *National Park and Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 19 n.5 (D.D.C. 1999).

and nearest potash lessee does not necessarily amount to an unlawful delegation of authority, because the 2012 Order provides two additional exceptions that do not, on their face, convey veto power to the potash lessee, but rather, are subject to the discretion of the BLM. *Cf. Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 707-08 & n.5 (D.C. Cir. 1977) (holding that no sub-delegation of decision-making authority occurred where federal Joint Board for Enrollment of Actuaries, exercising its broad discretion to set conditions for certifying actuaries to administer ERISA pension plans, required applicants either to pass Board exam or to pass an exam administered by recognized private national actuarial societies, because each applicant could obtain certification through process superintended by Board in every respect, and thus, Board had not abdicated its decision-making authority but merely created a reasonable "short-cut," contingent on approval of certain private organizations, to satisfy one of Board's own regulatory requirements).

Plaintiffs' Amended Complaint, however, is not merely a facial challenge; it also alleges that, in practice, BLM is unlawfully delegating its authority to the potash lessees. Plaintiffs have generally alleged facts indicating that BLM will only issue an APD if the nearest potash lessee approves, thus abdicating its duty to manage the Secretarial Area under principles of multiple use and sustained yield. Plaintiffs have also asserted that the mapping process gives potash lessees *de facto* regulatory control of the issuance of APDs. The Court finds that the question of unlawful sub-delegation to a private party presents a question of fact that survives Defendants' motion to dismiss. *Cf. Assiniboine*, 792 F.2d at 794-95 (holding that proof that agency did not independently review actions of delegated party would demonstrate unlawful delegation); *Tabor*, 566 F.2d at 708 n.5 (suggesting that unlawful sub-delegation claim against Board might have survived had plaintiffs alleged that Board had set pass rate for its exam at such a high level that,

in practice, private associations actually set the enrollment standards).

      **E.**      **Failure to State a Withdrawal of Lands Claim (Count Eight)**

A "withdrawal" under the FLPMA may occur if BLM withheld land within the Secretarial Area from "settlement, [lease] sale, location, or entry, under some or all of the general land laws, for the purpose of limiting" oil and gas development in favor of potash development. *See* 43 U.S.C. § 1702(j); *Mountain States Legal Foundation v. Hodel*, 668 F.Supp. 1466, 1473-74 (D. Wyo. 1987). Plaintiffs argue that they have stated a claim for *de facto* withdrawal of federal land from oil and gas development because BLM has imposed stipulations or conditions of approval that have made their existing leases uneconomic or unprofitable to develop, and thus, the Secretary has effectively removed the lands from leasing without following the proper procedural requirements. *See* Pls.' Resp. 25, ECF No. 32. Plaintiffs also allege that the establishment of buffer zones closes and withdraws leased oil and gas acreage from the public domain. Am. Compl. ¶ 217, ECF No. 13.

On its face, however, the 2012 Order does not withdraw lands from oil and gas leasing or otherwise suspend the issuance of oil and gas leases. This case is thus unlike *Hodel*, the case relied upon by Plaintiffs, where the BLM, acting pursuant to a written request by the Forest Service, ceased to act upon or issue oil and gas leases in the Bridger-Teton National Forest until the completion of a final EIS or Forest Plan. *See Hodel*, 668 F.Supp. at 1469-70. Here, Plaintiffs do not allege that BLM has stopped or suspended issuing *leases* in the Secretarial Area. Instead, Plaintiffs allege that BLM may not approve APDs on their previously leased lands and that buffer zone restrictions amount to closing and withdrawing leased oil and gas acreage. The Court disagrees that these allegations amount to a "withdrawal" within the meaning of the FLPMA sufficient to trigger the requisite procedural protections, because BLM has not withheld

land in the Secretarial Area from leasing or otherwise exempted the lands from the operation of public land laws.  *Cf. Southeast Conference v. Vilsack*, 684 F.Supp.2d 135, 144-45 (D.D.C. 2010) (holding that land use designations are not "withdrawals," but rather an exercise of Secretary's multiple-use planning responsibilities, even though practical effect of "old growth reserve" designation closed area to timber harvest).  *See also Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 784 (10th Cir. 2005) (defining "withdrawal" as temporarily suspending operation of some or all of the public land laws).  The Court will therefore dismiss Plaintiffs' Eighth Cause of Action for failure to state a claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (**ECF No. 29**) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Defendants' request to dismiss Plaintiffs' substantive and procedural claims for lack of ripeness is **DENIED**.

2.      Defendants' request to dismiss Plaintiffs' NEPA claims (Third and Fourth Causes of Action and portion of First Cause of Action) is **GRANTED** for failure to state a claim and Plaintiffs' NEPA claims are **DISMISSED WITH PREJUDICE**.

3.      Defendants' request to dismiss Plaintiffs' FACA and Sunshine Act claims (Sixth Cause of Action) and unlawful sub-delegation claim (Seventh Cause of Action) is **DENIED**.

4.      Defendants' request to dismiss Plaintiffs' unlawful withdrawal of lands claim (Eighth Cause of Action) is **GRANTED**.


_____
**UNITED STATES DISTRICT JUDGE**